UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

LISA MARTINO,                    )
                                 )
          Plaintiff,             )    CIVIL ACTION NO.
                                 )    14-10310-DPW
v.                               )
                                 )
AMERICAN AIRLINES FEDERAL        )
CREDIT UNION,                    )
                                 )
          Defendant.             )

MEMORANDUM AND ORDER
August 18, 2015

     Lisa Martino brought this action on her own behalf and on
behalf of a putative class challenging the practices of the
American Airlines Federal Credit Union (AAFCU), which deducts
funds owed on credit card bills from depository accounts held by
cardholders with the credit union.  Martino alleges that AAFCU's
policies with respect to such accounts violate the anti-offset
provisions of the Massachusetts Consumer Credit Cost Disclosure
Act (MCCCDA) and the Federal Truth in Lending Act (TILA).  AAFCU
claims that it has a valid security interest in the depository
accounts and is therefore permitted to take funds from the
accounts.  The parties now move for summary judgment on the
question of liability.

## I.   BACKGROUND

### A.   *Factual and Procedural Background*

Lisa Martino maintained three depository accounts with AAFCU.  The first account, opened in the early nineties, was in Martino's name alone, while the second and third accounts, opened in 2001, were joint accounts with her children.

Martino opened a credit card account with AAFCU in 2007. She failed to pay outstanding amounts due on her credit card, and on May 23, 2012, AAFCU withdrew funds from Martino's three depository accounts to pay the credit card debt.  This withdrawal was noted on Martino's monthly statements as "CC CHG OFF RECOVERY."

Martino brought this action alleging that AAFCU did not have the right to withdraw funds from the deposit accounts to pay off amounts due on the credit card.  Martino filed a complaint on December 31, 2013, in the Superior Court of Suffolk County, Massachusetts, and filed an amended complaint in January 2014.  AAFCU invoked the federal district court's diversity jurisdiction, 28 U.S.C. § 1332, and removed the action to this court in February 2014.  Martino filed a Second Amended Class Action Complaint on January 12, 2015, alleging individual and class claims against AAFCU in three counts: (1) Violation of the MCCCDA, 209 CMR 32.12; (2) Declaratory Judgment seeking a declaration that AAFCU's practices are in violation of the

2

MCCCDA; and (3) Violation of Chapter 93A §§ 2 and 9 through violations of the MCCCDA and TILA, 15 U.S.C. § 1666(h).

In July 2014, I set a schedule for discovery and briefing on dispositive motions, directing that discovery on class certification would be taken up after summary judgment practice. Martino moved for partial summary judgment against AAFCU on liability under Counts I, II, and III.  AAFCU filed an opposition and cross-moved for summary judgment establishing that it has no liability.

In its opposition to Martino's motion, AAFCU disclosed that both of the parties had been laboring under a significant misapprehension of the relevant facts.  From before the commencement of litigation and throughout the discovery period, AAFCU represented that the controlling credit agreement was the "Loanliner" credit agreement, which Martino signed on November 20, 2006.  The argument in support of Martino's initial Motion for Summary Judgment focused on the shortcomings of the Loanliner credit agreement, namely the fact that while it did contain some language about creating a security interest, it did not contain a sufficiently conspicuous disclosure.  AAFCU claimed in its opposition that it had uncovered information that the Loanliner credit agreement, while used in connection with AAFCU's extension of various types of credit, was not used in connection with approving a member for a credit card.  AAFCU

3

stated that the new information demonstrated that the Loanliner agreement does not have any connection to the credit card account that is at issue in this case, and that a different Credit Card Agreement controlled the lending relationship between AAFCU and its credit cardholders at the time that Martino began to use the credit card at issue.[1]

AAFCU presents this new information in the form of two affidavits, one by Susan Longley, the Vice President for Consumer Lending and Account Services, and the other by Lewis Cohen, the Vice President for Finance, concerning the procedure used and the documents that make up the credit card agreement at issue in this case.  AAFCU began offering credit cards to its members in 2004.  During the relevant period, AAFCU's Marketing Department in conjunction with the Lending Department developed criteria for members who might qualify for a credit card.  Using this criteria, AAFCU developed a list of members who may be

---

[1]  In her response, Martino initially claimed that she disputed all statements by the AAFCU about the inapplicability of the Loanliner agreement because these statements differ from what was previously provided to her through representations and during the course of discovery until that point.  At the motion hearing in this matter, Martino's counsel stated that Martino was not challenging the applicability of these newly-revealed documents and that she would not be requesting additional discovery about these documents under Rule 56(d) of the Federal Rules of Civil Procedure.  At the hearing, both parties stated that they are in agreement that, with these new documents, I have all of the facts and information necessary to make a legal determination about liability in this case.

preapproved for a credit card.  AAFCU developed a cut off for a credit score that would prequalify a member and checked that number against information from the credit bureau, resulting in a list of the names of members who qualified for preapproval. AAFCU then would send a preapproval offer letter through a vendor to each member on the list.

The two-page preapproval offer letter contained a Pre-Approved Acceptance Certificate for the member to sign and return to AAFCU if she wished to receive the credit card.  The Pre-Approved Acceptance Certificate contained a certification that the member has "read and agree[d] to all of the terms and disclosures contained in this application, and that everything you have stated in this application is accurate and complete . . . You acknowledge that use of any card issued in connection with this application constitutes your acceptance of, and will be subject to the terms and conditions of the Visa Platinum Rewards Credit Card Agreement.  You also agree that the terms of your account are subject to change as provided in the Card Agreement."  This certificate takes up approximately the lower quarter of the first page of the preapproval offer letter, and the certification is in very small print that is considerably less conspicuous than other text on the same page.  A copy of the preapproval offer letter is attached to this Memorandum and Order as Appendix I.

5

If a member submitted the certificate, AAFCU's vendor would mail the credit card and the Credit Card Agreement ("the Agreement") together in the same mailing to the approved member. The Agreement stated that the member acknowledged AAFCU could charge the member accounts for outstanding credit card debt. AAFCU claims that this preapproval process was used by AAFCU in November 2007 and was the process by which Martino and others were preapproved for the credit card through AAFCU.  AAFCU claims that by signing the Pre-Approved Acceptance Certificate and later using the credit card, Martino acknowledged that she received and agreed to the terms of the Agreement.

The Agreement that was sent with the credit card is four pages long.  On the bottom of the second page in paragraph 10, the Agreement states in bold, with a box surrounding the text:

> **10. Security Interest. You specifically grant the Credit Union a consensual security interest in all individual and joint accounts you have with the Credit Union now and in the future to secure repayment of credit extensions made under this Agreement.  The granting of this security interest is a condition for the issuance of any Card, which you may use, directly or indirectly, to obtain extensions of credit under this Agreement.**
>
> Shares and deposits in an Individual Retirement Account or in any other account that would lose special tax treatment under state or federal law if given as security are not subject to the security interest you are giving. You authorize the Credit Union to apply the balance in your individual or joint share accounts to pay any amounts due on your Account if you should default.

This Agreement was provided to members who were approved for this credit card simultaneously with the activated credit card itself, and it did not have any space for the cardholder to sign or otherwise endorse the agreement.  A copy of the Agreement is attached to this Memorandum and Order as Appendix II.

After AAFCU presented this information about the procedure and disclosures, Martino filed an Amended Motion for Summary Judgment addressing the new credit card agreement documents and procedures.  Martino argues that she is entitled to summary judgment because the newly-disclosed procedure and agreements presented by AAFCU violate the MCCCDA and the TILA.  After the hearing on the partial motions for summary judgment, Martino filed an unopposed Third Amended Complaint, advancing the same general theories and identical counts but reflecting the updated information on the applicable credit card agreement that was provided by AAFCU.

**B.   *Massachusetts and Federal Truth in Lending Statutes***

The MCCCDA, Mass. Gen. Laws c. 140D, § 1 et seq., governs consumer credit transactions.  The MCCCDA permits the Commissioner of Banks to "prescribe from time to time rules and regulations consistent with the Federal Fair Credit Billing Act, 15 U.S.C. § 1666-1666j and the regulations promulgated thereunder."  *Id.* § 29.

The regulations enacted by the Commissioner include 209 CMR 32.12(4)(amended 2015).  At the time relevant here[2], this regulation provided in relevant part:

---

[2] The regulation was amended as of January 2, 2015, to read "Offsets by Card Issuer Prohibited: Compliance with 12 C.F.R. 1026.12(d) constitutes compliance with 209 CMR 32.12(4)."

(4) Offsets by Card Issuer Prohibited.

(a) A card issuer may not take any action, either before or after termination of credit card privileges, to offset a cardholder's indebtedness arising from a consumer credit transaction under the relevant credit card plan against funds of the cardholder held on deposit with the card issuer.

(b) 209 CMR 32.12(4)(b) does not alter or affect the right of a card issuer acting under Massachusetts or federal law to do any of the following with regard to funds of a cardholder held on deposit with the card issuer if the same procedure is constitutionally available to creditors generally: obtain or enforce a consensual security interest in the funds; attach or otherwise levy upon the funds; or obtain or enforce a court order relating to the funds. . .[3]

209 CMR 32.12(4)(amended 2015).

_____

[3] Subsection (c) goes on to say that:

[The prohibition on offsets] does not prohibit a plan, if authorized in a separately signed agreement by the cardholder under which the card issuer may periodically deduct all or part of the cardholder's credit card debt from a deposit account held with the card issuer (subject to the limitations in 209 CMR 32.13(4)(a)); provided, however, that such action shall not be taken with respect to a disputed item if the cardholder so requests.  This agreement shall contain the following statement appearing conspicuously on the face thereof: YOU DO NOT HAVE TO SIGN THIS AGREEMENT IN ORDER TO OBTAIN A CREDIT CARD.

209 CMR 32.12(4)(c)(capitalization in original).

    The initial motion for summary judgment and opposition focused in part on the text of paragraph (c), but at the summary judgment hearing, counsel for AAFCU confirmed that it was not claiming an exception to the offset prohibition through a plan as specified under paragraph (c).  In response, counsel for Martino stated that, in the absence of AAFCU's reliance on a plan under subsection(c), Martino was not pressing arguments under subsection (c) such as those related to the absence of the capitalized language.

TILA also contains prohibitions on offsets, 15 U.S.C.
§ 1666(h).  This section is titled "Offset of cardholder's
indebtedness by issuer of credit card with funds deposited with
issuer by cardholder; remedies of creditors under State law not
affected."  The section provides:

> (a) Offset against consumer's funds
> A card issuer may not take any action to offset a
> cardholder's indebtedness arising in connection with a
> consumer credit transaction under the relevant credit
> card plan against funds of the cardholder held on
> deposit with the card issuer unless--
>> (1) such action was previously authorized in
>> writing by the cardholder in accordance with a
>> credit plan whereby the cardholder agrees
>> periodically to pay debts incurred in his open
>> end credit account by permitting the card issuer
>> periodically to deduct all or a portion of such
>> debt from the cardholder's deposit account, and
>> (2) such action with respect to any outstanding
>> disputed amount not be taken by the card issuer
>> upon request of the cardholder. . .
> (b) Attachments and levies
> This section does not alter or affect the right under
> State law of a card issuer to attach or otherwise levy
> upon funds of a cardholder held on deposit with the
> card issuer if that remedy is constitutionally
> available to creditors generally.

15 U.S.C.A. § 1666h.

The TILA, including the prohibition on offsets, is
implemented through regulations known as Regulation Z, codified
at 12 C.F.R. § 226.  The federal regulation concerning offsets,
12 CFR § 226.12(d), contains the same relevant language as 209
CMR 32.12(4)(amended 2015) of the MCCCDA.[4]

---

[4] The only difference between the texts of the Massachusetts and

The Official Staff Interpretation[5] to 12 C.F.R.

§ 226.12(d)(2) provides further guidance about the nature of a

security interest that can be validly enforced and that will not

be considered an improper offset:

> *Paragraph 12(d)(2)*
>
> 1. Security interest — limitations. In order to qualify for the exception stated in section 226.12(d)(2), a security interest must be affirmatively agreed to by the consumer and must be disclosed in the issuer's account-opening disclosures under section 226.6. The security interest must not be the functional equivalent of a right of offset; as a result, routinely including in agreements contract language indicating that consumers are giving a security interest in any deposit accounts maintained with the issuer does not result in a security interest that falls within the exception in section 226.12(d)(2). For a security interest to qualify for the exception under section 226.12(d)(2) the following conditions must be met:
>> i. The consumer must be aware that granting a security interest is a condition for the credit card account (or for more favorable account terms) and must specifically intend to grant a security interest in a deposit account. Indicia of the consumer's awareness and intent include at least one of the following (or a substantially similar procedure that evidences the consumer's awareness and intent):
>>> A. Separate signature or initials on the agreement indicating that a security interest is being given.

---

federal regulations is that the federal regulation does not include the requirement in paragraph (c) that the writing be in a separately signed agreement and that the agreement contain the capitalized language.  A plan under paragraph (c) is not at issue in this case.  *See* note 6, *supra*.

[5] The Official Staff Interpretations are issued by officials of the Board of Governors of the Federal Reserve System, Division of Consumer and Community Affairs.  They are authorized to issue "official staff interpretations of the regulation."  12 C.F.R. Pt. 226, App. C.

>> B. Placement of the security agreement on a
>> separate page, or otherwise separating the
>> security interest provisions from other contract
>> and disclosure provisions.
>> C. Reference to a specific amount of deposited
>> funds or to a specific deposit account
>> number. . .

Official Staff Commentary on Regulation Z, F.R.R.S. 6-1170.7,

2006 WL 3947402, at *1.

The Massachusetts statute and regulations are "closely

modeled on the Federal Truth-in-Lending Act . . . [and] Federal

court decisions are instructive in construing parallel State

statutes and State regulations."  *Mayo* v. *Key Financial*

*Services, Inc.,* 678 N.E.2d 1311, 1313 (Mass. 1997).

## II. ANALYSIS

### A.    *Standard of Review*

The two parties have moved for summary judgment pursuant to

Rule 56 of the Federal Rules of Civil Procedure.   Summary

judgment is appropriate only if I am satisfied "that there is no

genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The party seeking summary judgment bears the initial

burden of informing a court of the basis for the motion, and

identifying aspects of the record that demonstrate the absence

of a genuine issue of material fact.  *Celotex Corp.* v. *Catrett*,

477 U.S. 317, 323 (1986).  If the moving party satisfies its

burden, the burden shifts to the non-moving party to set forth

11

facts showing the existence of a genuine triable issue.  *Id.* at 324.

**B.    *Burden of Proof for the Anti-Offset Provision***

The burdens of proof for an offset violation as alleged here are not apparent from the relevant statutes and regulations.  The TILA prohibition on offsets is presented as an absolute bar preventing a card issuer from taking action to offset credit card debt against funds held on deposit with the card issuer.  15 U.S.C. § 1666h(a).  The sole exception to the no-offset rule is when a cardholder agrees in writing to periodic deductions, *id.* at § 1666h(a)(1), an exception that defendants concede is not applicable in this case.  The statute notes that this prohibition does not affect the right of a card issuer to attach or levy upon funds of a cardholder under state law.  *Id.* at § 1666h(b).  Regulation Z further clarifies that the prohibition on offsets "does not alter or affect the right of a card issuer acting under state or federal law to . . . obtain or enforce a consensual security interest in the funds." 12 C.F.R. § 226.12(d)(2).  The MCCCDA anti-offset provision has the same structure, prohibiting offsets but noting that the provision does not apply to otherwise lawfully created consensual security interests.  *See* 209 CMR 32.12(4)(amended 2015).

Plaintiffs argue that it is Martino's burden to make an initial showing that AAFCU withdrew her funds on deposit with the credit union to pay a credit card debt, and then the burden shifts to AAFCU to prove compliance with TILA and MCCCDA.  AAFCU has not briefed the question of the burden of proof at all, although a party in defendant's position might argue that proving that something is an offset necessarily involves proving that it is not something other than an offset; in that sense, proving that there is no valid consensual security interest is part of Martino's burden in showing that there is a TILA and MCCCDA violation.

In *Gardner* v. *Montgomery County Teachers Federal Credit Union*, 864 F.Supp.2d 410, 415-18 (D. Md. 2012), Judge Bredar concluded after a lengthy analysis that the anti-offset provision of TILA is structured to prohibit offsets, and that the plaintiff has the burden of showing that an offset-type transaction has occurred.  Once a plaintiff has made that showing, then the defendant bears the burden of showing that the transaction is actually a consensual security interest, not an offset.  *Id.* at 416.  He concluded that the statute follows the "general proposition that once a debtor makes a threshold showing that a TILA violation has occurred, then the burden shifts to the creditor to prove its compliance.  *Id.* at 415 (collecting cases for this proposition).

13

Judge Bredar's analysis in *Gardner* is based in part on his conclusion that offsets and security interests are distinct legal concepts, *id.* at 417. By contrast, the analysis by Judge Marlar in *In re Lyon*, 2010 WL 3777827 (Bankr. D. Ariz. Sept. 20, 2010), implicitly conflates the two, considering a security interest to be a form of permitted offset. *Id.* at *2 ("if [the credit union] has a valid security interest, it has a right to setoff under applicable federal and/or state law . . ."). While Judge Marlar's framing of the relationship between offsets and security interests in *Lyon* may provide some support for the idea that proving an offset requires disproving a security interest, the *Lyon* decision does not address the question of the applicable burden of proof.

After considering the structure and content of the statute and regulations, I conclude that a plaintiff can make a sufficient showing of an offset without disproving the existence of a security interest. The framework requires the plaintiff to make an initial showing that the transaction at issue is an offset and then the burden shifts to the defendant to show that the transaction actually involves a permitted security interest.

AAFCU does not contest that it withdrew funds from Martino's deposit accounts to pay off her outstanding credit card debt. This fact alone is sufficient to meet Martino's burden to prove a violation of TILA and MCCCDA's prohibitions on

14

offsets by card issuers against a cardholder's funds on deposit with the issuer. *See* 15 U.S.C. § 1666h. It thus became AAFCU's burden to prove that there was a consensual security interest.

## C. *Creation of a Valid Security Interest under TILA and MCCCDA*

To determine whether AAFCU has shown that this was not an offset because a valid security interest was created in compliance with TILA and MCCCDA, I look to the documents that constitute the agreement itself. The original pre-approval letter sent to Martino, directing her to sign and return a Pre-Approved Acceptance Certificate if she wished to receive the credit card, did not contain any language at all about a security interest. While the Certificate included language that she was accepting the terms and conditions of the Agreement, the Agreement was not provided at the time that Martino signed the Certificate and therefore could not have been reviewed at the time the Certificate was signed.

The Agreement arrived later by mail, simultaneously with an activated, usable credit card. The Agreement is the only document that mentions a security interest. The Agreement did not have any space for Martino to initial or sign and did not require Martino to acknowledge in any way receipt of or agreement to the terms once she had received them. It is undisputed that Martino used the card that was issued to her after receiving the card and the disclosures.

15

Martino argues that the credit documents and procedure that
were used in this case were inadequate to create a consensual
security interest in her depository accounts.  AAFCU contends
that the documents in combination with each other and with
Martino's use of the credit card satisfy the requirements of
TILA and MCCCDA.  AAFCU points to the fact that the Certificate
that Martino signed stated that using the card meant accepting
the terms of the not-yet-provided Agreement, and that Martino
used the card after receiving the Agreement.  Given the language
in the Certificate, which Martino signed, AAFCU argues that her
use of the credit card after receiving the terms of the
Agreement constituted the manifestation of agreement required by
the statutes.  Martino counters that an enforceable security
interest was not created because she never signed or otherwise
agreed to the security interest disclosed in the Agreement and
the language of the Agreement is not sufficiently conspicuous
for me to conclude that Martino specifically intended to grant
the security interest.

The strict requirements under TILA and MCCCDA and their
accompanying regulations make clear that these consumer
protection statutes go beyond the requirements of contract law.
Official Staff Commentary on Regulation Z, 2006 WL 3947402
("routinely including in agreements contract language indicating
that consumers are giving a security interest in any deposit

accounts maintained with the issuer . . . ." is not sufficient
to create the exception).  Under Regulation Z, a valid security
interest is to be distinguished from an unlawful offset, because
a valid security interest must be "affirmatively agreed to by
the consumer," a consumer must be aware that granting a security
interest is a condition for the credit card account, and the
consumer must specifically intend to grant a security interest
in a deposit account.  *Id.*  The Official Staff Commentary on
Regulation Z provides three indicia of a consumer's awareness
and intent: (1) a separate signature or initials near the
disclosure creating the security interest; (2) conspicuousness
of the security agreement by placing it on another page or
otherwise separating it from other provisions; and (3)
referencing a specific amount of deposited funds or a specific
account number.  *Id.*  Under the Staff Commentary, at least one
of the three, or a similar procedure evidencing a consumer's
awareness and intent, must be met for the disclosure of a
security interest to be deemed valid under TILA.  *Id.*

The timing of the disclosures made to Martino is
significant and provides context for addressing awareness and
intent.  There is no dispute that AAFCU provided the Agreement,
which was the first document to disclose the purported security
interest, contemporaneously with the activated, usable, credit
card, meaning that the account had already been approved and

17

opened.   Martino argues that it was improper of AAFCU to fail to provide the disclosure about the security interest before AAFCU provided Martino with the credit card.   Given that the card was provided simultaneously with the disclosure, Martino argues that a consumer would not know that she was granting a security interest "as a condition for the credit card account" as required by the Official Staff Commentary.   She notes that, given the simultaneous provision of the activated credit card, "it is difficult to see how a card-holder would understand that granting Defendant the security interest was a condition of [her] getting the account in the first place." *Gardner*, 864 F.Supp.2d at 420.

Providing the disclosures at the same time as the card itself is not necessarily fatal.   The existence of a security interest in connection with an open-end unsecured credit plan is the type of disclosure that, under TILA, need not be made at the time of solicitation or an application to open a credit card account, *see* 12 C.F.R. § 226.5a (listing disclosures that must be made at the time of solicitation or application), but rather may be made "before the first transaction is made under the plan," *see* 12 C.F.R. § 226.5 (stating the "general rule" for disclosures required by § 226.6, which include security

interests, *see* 12 C.F.R. § 226.6(b)(5)(ii)).[6]  The timing of the
disclosures contemporaneously with the activated card is not, on
its own, an indication that the security interest was not
properly created.  As discussed below, however, the timing may
still be relevant to the question whether Martino could have
specifically intended and affirmatively agreed to grant a
security interest in her deposit accounts.

Martino does not argue that the actual language of the
Agreement in paragraph 10, which purports to create the grant of
a security interest, is inadequate.  *Cf. In re Clark*, 161 B.R.
290, 292 (Bankr. N.D. Fla. 1993)(language claiming the ability
to enforce a statutory lien does not create a consensual
security interest).  The initial question is whether the
location and presentation of that language is sufficiently
conspicuous to meet any of the three indicia outlined in the
Staff Commentary.

The first of the indicia, "separate signature or initials
on the agreement indicating that a security interest is being
given" is clearly not met.  There was no space for signing or

---

[6] At the hearing, the plaintiffs directed my attention to *Polk* v.
*Crown Auto, Inc.*, 221 F.3d 691, 692 (4th Cir. 2000), which
interprets the required timing for disclosures for closed-end
secured credit, 12 C.F.R. § 226.17, as requiring disclosures to
be made "before consummation of the transaction."  *Polk* is
inapposite because it concerns closed-end credit transactions,
not open-end ones like the general line of credit issued to
Martino.

initialing anywhere on the Agreement, let alone specifically near the security interest provision.  While the regulations do not explicitly require a document creating a security interest be signed, the fact that the staff instructions reference a "*separate* signature" suggests an underlying assumption that it would be in addition to a more generalized signature on the agreement.

The second of the indicia, "placement of the security agreement on a separate page, or otherwise separating the security interest provisions from other contract and disclosure provisions," is a closer question.  The security interest provision is plainly not on its own page and not separated by space or difference in font size, but it is distinguished from other text on the second of four pages of the Agreement through the use of bolded text surrounded by a box.[7]  In contrast, in *Gardner*, the language on which the credit union relied was "buried on the eighth of twenty pages of fine print," despite one sentence of the provision being in bold.  *Gardner*, 864 F.Supp.2d at 420.  In *In re Okigbo*, 2009 WL 5227844 (Bankr. D. Md. Dec. 30, 2009), the security interest disclosures were on the second of a thirteen-page credit application and disclosure form.  *Id.* at *5.  Although the language was located only a

---

[7] Another provision on page three of the Agreement also is in a box with bolded text.

paragraph above the borrower's signature, the court concluded that "there [we]re none of the bells and whistles required so as to focus Debtor's attention on it." *Id.*  In *Lyon*, 2010 WL 3777827, in which the bankruptcy court did find that a consensual security interest had been created, the relevant language was in two locations — capitalized and bolded in the tenth paragraph, and then capitalized again immediately below the signature. *Id.* at *1.

In each of these cases, the conspicuousness of the placement and design of the security interest language was affected by its appearance, its location within the document, and its proximity to a signature.  The placement of the language in this case is not particularly separate; it is located as one among twenty-six numbered paragraphs of similar size.  Its location on the second of four pages, rather than buried deeper in a longer text, is not altogether obscured but could not on its own be considered to be "separated."  However, the bolded text and the box around the text do effectively draw more attention to this provision and the one other boxed provision than to the other provisions of the agreement.  Given that there is no signature anywhere on the Agreement, there is no nearby signature to draw additional attention to this text as there was in *Lyon*.  On this second of the three indicia, I conclude that the bold text and boxing around the security interest agreement

is minimally sufficient to make out that this language was separated from the other text of the Agreement.

Courts are split about whether the third of the indicia, reference to a specific amount of deposited funds or to a specific deposit account number, is met where the text contains language such as "all individual and joint accounts you have with the Credit Union now and in the future," as the text states in this case. In *Lyon*, Judge Marlar found that this was met where the language "specifically references *any and all* of Debtors' accounts with [the credit union]." 2010 WL 3777827, at *4. In contrast, in *Gardner*, Judge Bredar found that this was not met where "the provision simply refers to 'any' and 'all' accounts with Defendant." 864 F.Supp.2d at 420. Given the purpose of these indicia, to provide evidence of a consumer's awareness and specific intent to grant a security interest, I hold that the language in this Agreement referring to "all" accounts is insufficient. Referring to a specific account number belonging to a consumer or highlighting the full amount that is currently in such an account that could be taken if the security interest were executed draws attention to the nature of the agreement, and particularly the potential stakes for the cardholder, in a significantly more pointed manner than simply referring in an undifferentiated fashion to "any" or "all" accounts.

Compliance with one of the three indicia is necessary but not sufficient to establish that the security interest was affirmatively agreed to and specifically intended to be granted. Ultimately, my analysis of the various indicia and other indications of awareness and intent must be in service of these framing requirements.  The lack of any signature or other acknowledgment of receipt of the Agreement is a significant obstacle to the validity of this security agreement.  AAFCU argues that the earlier signed Certificate acknowledging that use of the credit card meant Martino accepted the not-yet-provided Agreement, the separated language of the Agreement, and Martino's use of the credit card combine to make out Martino's affirmative agreement to the security interest.  AAFCU emphasizes that Martino's use of the credit card was an affirmative act, and even though she had been approved for the credit card and provided with an activated card, if she had chosen not to use the card, she would never have been subject to the conditions of the Agreement and the security interest at issue here.

AAFCU relies upon cases standing for the proposition that use of a credit card constitutes agreement to be bound by the terms of the credit card agreement.  *See, e.g.*, *Ineman* v. *Kohl's Corp.*, 2015 WL 1399052, at *4 (W.D. Wis. Mar. 26, 2015) (holding that an arbitration clause in a credit card agreement is valid

23

because the cardholder used the credit card even if the cardholder did not sign, read, or receive the credit card agreement); *Brown* v. *Federated Capital Corp.*, 991 F.Supp.2d 857, 861(S.D. Tex. 2014)("In the context of a credit card, a party is bound by the terms of a credit card agreement if the party uses the credit card, even if the party does not sign the credit card agreement and even if the credit card agreement is not delivered to the party."); *Heiges* v. *JP Morgan Chase Bank, N.A.*, 521 F.Supp.2d 641, 647 (N.D. Ohio 2007)("under Ohio law credit card agreements are contracts whereby the issuance and use of a credit card creates a legally binding agreement.") (internal quotation marks omitted); *Karmolinski* v. *Equifax Info. Servs.*, LLC, 2005 WL 7213289, at *2 (D. Or. Oct. 31, 2005) ("Once plaintiff was issued the card and proceeded to use it to obtain goods or services, he agreed to the terms of the Agreement.").

Each of the cases cited by AAFCU concern whether a valid contract exists where a party may not have signed an agreement but did use a card.  None of the cases prove persuasive on the issue in this case — whether use of a card can constitute "affirmative agreement" that is sufficient to meet any heightened requirement under TILA or a state consumer protection statute.  TILA and the MCCCDA specifically require the level of intent and agreement for a valid security interest to *exceed* that required for a standard contract.  *See* Official Staff

Commentary on Regulation Z, 2006 WL 3947402 (routine contract language is insufficient).

Similarly, although a duty to read can sometimes be the foundation for finding a contract, *see, e.g.*, *Rivera* v. *Centro Medico de Turabo, Inc.*, 575 F.3d 10, 20 (1st Cir. 2009)("A party is deemed to know the contents of a contract to which he assents," concerning an arbitration clause in a signed contract), that principle is not helpful here.  While deeming a party to have knowledge or finding constructive knowledge may be sufficient for a standard contract, *see Consol. Edison Co. of New York* v. *United States*, 221 F.3d 364, 371 (2d Cir. 2000)("In general, individuals are charged with knowledge of the contents of documents they sign—that is, they have 'constructive knowledge' of those contents."), it is plainly insufficient here, where the regulations include requirements above and beyond those necessary to create a contract, including affirmative agreement.[8]

_____

[8] The parties have not cited, nor have I found, case law elaborating on the meaning of affirmative agreement in the context of TILA or MCCCDA.  I recognize that in other contexts, not inflected by heightened statutory consumer protection requirements, the idea of affirmative agreement is used most typically in cases about online contracts to distinguish contracts that require a person to either click "I agree" or similarly acknowledge receiving and acknowledging a disclosure from those that do not.  *See, e.g.*, *Hofer* v. *Gap, Inc.*, 516 F.Supp.2d 161, 166-67 (D. Mass. 2007)("consumers who book travel through Expedia.com must affirmatively agree to Expedia's *Web Site Terms, Conditions, and Notices* to make on-line bookings;

AAFCU has not directed me to, nor have I found, any cases in which courts have granted a valid security interest based on disclosures contained in an unsigned document provided only once a credit card has been provided to the consumer.  The only case to address similar facts is *Gardner*, 864 F.Supp.2d 410.  The loan application in *Gardner* contained language that read, "by signing below, using, or permitting another to use the credit card(s), you agree that you will be bound by the VISA agreement accompanying the credit card(s)."  *Id.* at 418.  The defendant later sent disclosures that included language about the security interest at the time the credit card account was granted and then annually thereafter.  *Id.* at 418-19.  The defendants in *Gardner* did not produce a signed loan application, but they argued that it is reasonable to assume that the plaintiffs signed the loan application since the plaintiffs were ultimately provided with a credit card.  *Id.* at 418.  The claims in *Gardner* parallel those made by Martino here.  While AAFCU attempts to distinguish *Gardner* because the loan application document was

---

although users can browse the site, tickets cannot be purchased or reserved unless the user has 'clicked through' and accepted the terms and conditions."); *F.T.C.* v. *Direct Benefits Grp., LLC*, 2012 WL 5430989, at *4 (M.D. Fla. Nov. 7, 2012)("no consumer could be enrolled in the programs without affirmatively checking a box or at least clicking an 'okay' button in response to a directive . . ."); *CruiseCompete, LLC* v. *Smolinksi & Assoc.*, Inc., 859 F.Supp.2d 999, 10004 (S.D. Iowa 2012)("a consumer using the CuriseCompete.com website must affirmatively agree that she is 'not a cruise travel agent . . .'").

not signed in *Gardner* whereas it was signed here, the court in *Gardner* did not rely on the fact that the copy produced by the defendant was not signed.

In *Gardner*, Judge Bredar found none of the three indicia applicable, and noted that the timing of the disclosures — only after the consumer was granted the credit card — was inconsistent with the requirement that the card-holder understand that granting a security interest is a condition of getting the account in the first place. *Id.* at 420. While the timing of the disclosure contemporaneously with the provision of an activated card is not necessarily problematic, *see* 12 C.F.R. § 226.5(requiring a security interest disclosure in § 226.6 to occur before the first transaction), timing is still important because affirmative agreement has to take place after possible knowledge of the terms. Although not made explicit, the holding in *Gardner* necessarily assumes that an earlier affirmation that use of the credit card would constitute acceptance of terms of a not-yet-provided agreement was insufficient.

Given AAFCU's composite theory that the various documents and Martino's use of the credit card combine to reach the level of specific intent and affirmative agreement required to establish the security interest, I must look beyond the Agreement itself. AAFCU claims that Martino's signature on the Certificate established that her use of the credit card would

27

constitute acceptance of the terms of the Agreement.  Therefore, just as the security interest provision of the Agreement had to be sufficiently conspicuous, the Certificate that Martino signed must also be sufficiently clear and conspicuous in order for me to be able to draw the inference that Martino knowingly and intentionally intended her use of the card to function as acceptance of the Agreement.  The text on the Certificate, however, is extremely small and the text about acceptance of the Agreement is not separated from the other text in any way.  The relevant text has the quality of prototypical contract boilerplate language.  More importantly, the Agreement itself was not provided at the time that Martino signed the Certificate, so it is impossible that Martino could have understood the full import of what she was signing.  AAFCU's argument that the Certificate provides a hook for treating the subsequent use of the card as an affirmative agreement in the context of the facts of this case would be to permit AAFCU to structure the transaction in precisely the type of confusing and misleading "disclosure" that TILA and MCCCDA were designed to prevent.

    The purpose of TILA is "to promote the 'informed use of credit,' which TILA explicitly says results from 'an awareness of the cost thereof by consumers . . .'" *Shaner* v. *Chase Bank USA, N.A.*, 587 F.3d 488, 492 (1st Cir. 2009)(quoting 15 U.S.C.

§ 1601(a)).  TILA is "intended to balance scales thought to be weighed in favor of lenders and is thus to be liberally construed in favor of borrowers." *Bizier* v. *Globe Fin. Servs., Inc.*, 654 F.2d 1, 3 (1st Cir. 1981).  The provisions of TILA and MCCCDA at issue here preventing offsets and adding elements necessary to establish a consensual security interest are directed to ensuring that consumers' decisions about granting such an interest be made knowingly and intentionally.  The manner in which AAFCU attempted to establish the security interest in this case falls short of those requirements.

Taking the three indicia of specific intent laid out in the Official Staff Commentary together as a starting point, and focusing on the nature of the awareness required — awareness that the security interest is a condition of receiving the credit card account — I conclude that the combination of the Pre-Approval Certificate, the Credit Card Agreement, and Martino's subsequent use of the credit card is insufficient to create a consensual security interest under both TILA and MCCCDA.  AAFCU's deduction of money from Martino's deposit account to pay her credit card debts was the equivalent of an offset, which is prohibited under TILA and MCCCDA.

## D.  *Chapter 93A Claims*

MCCCDA is codified in Chapter 140D of the Massachusetts General Laws.  Section 34 of this statute provides, "A violation

of this chapter, or any rule or regulation issued hereunder, shall constitute a violation of chapter ninety-three A." Mass. Gen. Laws c. 140D § 34. Given that I have found above that the AAFCU's disclosures were inadequate to create a consensual security interest and that the AAFCU's removal of funds from Martino's depository accounts was therefore an unlawful offset under 209 C.M.R. 32.12, I also must conclude that such removal is a violation of Mass. Gen. Laws c. 93A.

## III. CONCLUSION

For these reasons, it is hereby ORDERED that:

1. Plaintiff's initial Motion for Partial Summary Judgment (Doc. No. 21) is deemed MOOT;

2. Plaintiff's Amended Motion for Summary Judgment (Doc. No. 44) is GRANTED;

3. Defendant's Cross-Motion for Summary Judgment (Doc. No. 37) is DENIED, and it is FURTHER ORDERED that:

The parties, on or before September 16, 2015, shall submit a proposal for bringing this case to final judgment, including resolution of the question of class certification, now that liability is established.


**/s/ Douglas P. Woodlock**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

30



# *APPENDIX I*



THERE'S STILL TIME FOR YOU TO **WIN A NEW CAR**
www.2007RoadToSuccess.com

**Open your account and get 3 entries!**

Sample Sample
123 Anywhere St.
Anytown, TX 12345

ԼԼ.ԼԼ..Լ.ԼԼԼԼ.Լ.ԼԼ.ԼԼ..ԼԼԼ..ԼԼ..ԼԼ.Լ.ԼԼ.Լ.Լ..ԼԼ.ԼԼԼ

FOLD LINE

Dear <First> <Last>,

The holidays are just around the corner. Soon you'll be thinking of holiday gifts, entertaining, and decorating the house. You need a card that can give you the purchasing power you need and the rewards you expect. **You're already preapproved for the AA Credit Union Visa® Platinum Rewards Credit Card.**



**0% APR**

- **0%** APR[1] through June 30, 2008 **on purchases** that post on or before December 31, 2007.
- That's over **6 months of savings**.



**FREE REWARDS**

- **You're automatically enrolled** in the Connection Points rewards program.
- **5,000 bonus Connection Points** after your first credit card transaction.
- **Earn points** for every dollar charged in signature-based purchases.
- **Redeem for free** airline tickets, exotic adventures, vacation packages, electronics, flying lessons, theater tickets, and so much more. **Choose from over 500 rewards.**

**LOW FEES**

- **No** Annual Fee.
- **No** Balance Transfer Fee – most cards charge 3% – with no maximum.
- **No** Cash Advance Fee – most cards charge 3%.
- **Low 1%** International Transaction Fee – most cards charge 3%.

**Request your card today: Your** preapproved status expires December 14, 2007 – call (800) 533-0035, go online to www. AACreditUnion.org, visit your AA Credit Union branch, or complete and mail the attached preapproved acceptance certificate in the postage-paid envelope provided.

Sincerely,

*John M. Tippets*

John M. Tippets
CEO

AA Credit Union is a registered trademark of American Airlines, Inc. Connection Points are powered by ScoreCard®.
**This Credit Union is federally insured by the National Credit Union Administration.**
[1]Annual Percentage Rate (APR) – Please refer to the reverse side of this letter for important disclosures containing rate, fee and other cost information concerning this card.

CONNECTION **◆◆**POINTS**◆◆**

You can choose to stop receiving prescreened offers of credit from this and other companies by calling toll free 1-888-567-8688. See PRESCREEN & OPT-OUT NOTICE on reverse side for more information about prescreened offers.

FOLD LINE

PERF LINE

Detach and return in the enclosed postage paid envelope or drop at any of our branch offices.

## PreApproved Acceptance Certificate

John Sample
123 Main Street
Any City, State XXXXX

Home Phone ☐☐☐-☐☐☐-☐☐☐☐  Work Phone ☐☐☐-☐☐☐-☐☐☐☐

Primary Social Security Number ☐☐☐-☐☐-☐☐☐☐  Date of Birth ☐☐-☐☐-☐☐

Choose Card Design ☐ ☐ ☐

By signing below, you certify that you are at least 18 years of age, that you have read and agree to all of the terms and disclosures contained in this application, and that everything you have stated in this application is accurate and complete. You authorize us to check and verify your credit, employment, and income references. You acknowledge that use of any card issued in connection with this application constitutes your acceptance of, and will be subject to the terms and conditions of the Visa Platinum Rewards Credit Card Agreement. You also agree that the terms of your account are subject to change as provided in the Card Agreement. Use of your card signifies that you have read and agree to abide by the ScoreCard Connection/Bonus Point program rules.

Primary Signature **X**

### Balance Transfer Option - Start Saving Today!

Account Number ☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐

Card Issuer ____  Amount to transfer $☐☐,☐☐☐.☐☐

Card Issuer Address ____  City/State/Zip ____  Phone Number ____

Employer _____  10/07

Monthly Housing Payment $☐☐,☐☐☐.00   Monthly Individual Income* $☐☐,☐☐☐.00

*Alimony, child support, or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation.

Yes! Please send a secondary card at no additional cost for:

Name _____

Secondary Social Security Number ☐☐☐-☐☐-☐☐☐☐  Date of Birth ☐☐-☐☐-☐☐

AAFCU000100

AFTR-VO2 (BACK) 1010

| Annual Percentage Rate (APR) for Purchases | **0%** through 06/30/2008 on purchases that post to the account on or before 12/31/2007. After 06/30/2008, the 0% APR will adjust to the standard variable purchase APR on your account. <br><br> Standard Purchase APR: **11.74% - 17.74%˙** |
|---|---|
| Other APRs | Balance Transfer APR: 11.74% - 17.74% <br> Cash Advance APR: 11.74% - 17.74% <br> Penalty APR: A fixed rate currently equal to 18.00%. See explanation below ** |
| Variable Rate Information | Your APR may vary. The rate for purchases, cash advances and balance transfers is determined quarterly by adding between 3.99% – 9.99% to the Prime Rate and is capped at 18.00%. See explanation below *** |
| Grace Period for Purchases | 20 days |
| Method of Computing the Balance for Purchases | Average Daily Balance (including new purchases) |
| Annual Fee | $0 |
| Cash Advance/Balance Transfer Fee | $0 |
| International Transaction Fee | 1% of the transaction amount on all foreign transactions after its conversion to U.S. dollars. |
| Other Fees | Late Payment Fee: $25 <br> Over The Limit Fee: $25 |
| Minimum Finance Charge | $.50 except where prohibited by law |

The information about the costs of the cards described in this offer is accurate as of 09/2007. This information may have changed after that date. To find out what may have changed, call us at (800) 533-0035. **Eligibility for this promotion is limited to those applications which are completed and approved between 10/01/2007 and 12/14/2007.** Per our card agreement, the Credit Union may apply payments to balances with the lowest annual percentage rate first. Use of your card signifies that you have read and agree to abide by the ScoreCard Connection/Bonus Point Program Rules.

˙ Your precise rate is based on your creditworthiness. Contact the Credit Union for your qualifying rate.

** If you are thirty (30) or more days delinquent in making a payment or past due twice in a twelve (12) month period, the APR on your account will increase to a fixed rate of 18.00%. The APR on this account will never be higher than 18.00%.

*** The rate is determined by an Index, which is the Prime Rate on the last business day of each calendar quarter as published in the "Money Rates" section of The Wall Street Journal. Rate changes based on changes in the Index will take effect on the third business day after the Index change is published.

**Balance Transfer Rate Terms and Conditions** – Balance transfers will be processed at the standard balance transfer APR for this account. If we do not receive all of the necessary information for the transfer, the balance transfer will not be completed. Please allow up to 4 - 6 weeks before payments to your other accounts are made. Accordingly, you should continue to make all required payments until you confirm that the balance transfers were made. Balance transfers as well as purchases and cash advance transactions are subject to your available credit. Balance transfers may not be used to pay any American Airlines Federal Credit Union accounts. Balance transfer requests will be processed from the lowest to the highest dollar amount. If a balance transfer request is more than your available credit limit, we will automatically lower the balance transfer amount to your available credit and complete the transfer. You may only make balance transfers to accounts that list you as an accountholder. Transfer of balances, which contain disputed purchases or other charges, may cause you to lose your dispute rights with regard to those purchases or other charges.

**Terms and Conditions of Preapproval Offer** – This acceptance certificate is only valid for individuals and must be signed by the person to whom it is addressed. This acceptance certificate is not transferable and is not available to a company or corporation. The Credit Union reserves the right to obtain a current credit report. 'Preapproved' means that a preliminary determination of favorable creditworthiness was made based on your credit report. In some situations, we might be unable to extend credit to you. This offer is subject to change by the Credit Union at any time. By signing or returning this application or otherwise responding to this offer, you request the Credit Union to open an account and issue card(s). You understand that you must provide all the information requested in the application, and you certify that such information is complete and accurate. You authorize the Credit Union to verify the information on this application. You understand that the acceptance or use of any card issued, will be subject to the terms of this application and the Credit Card Agreement, and you agree to be responsible for all charges incurred according to such terms. You understand that if you fail to fulfill the terms of your credit obligations, the Credit Union may submit a negative credit report reflecting on your credit record to a credit-reporting agency. You are at least 18 years old. You understand that the Credit Union has the right not to open your account if the information provided is incomplete, inaccurate or unverifiable; your name and/or mailing address has been altered; or your application or response to this offer has been received after the offer expiration date. You understand that your credit line will be established based on your income, employment and your credit report at the time you respond. If the information on your credit report has changed so that you no longer meet the Credit Union's requirements, the Credit Union may choose to not issue a credit card.

**FAIR CREDIT REPORTING ACT NOTICE.** You were selected for this offer based upon the information in your credit report, which satisfied the Credit Union's criteria for creditworthiness. The offer, after you respond to it, is conditioned upon you continuing to satisfy the creditworthiness criteria used to select you for the offer and upon you satisfying any applicable criteria bearing on your creditworthiness, including your income, employment, and any other information provided on your application.

**NY Residents:** We may obtain your credit report in connection with this extension of credit, and subsequently for updates, collection or other legitimate purposes associated with extension of the credit. Upon your request, we will inform you whether we obtained a credit report, and if so, the name and address of the consumer-reporting agency that furnished the report. **OH Residents:** Ohio anti-discrimination laws require creditors to make credit equally available to all creditworthy customers and that credit reporting agencies maintain separate credit histories on individuals upon request. The Ohio Civil Rights Commission administers compliance with this law. **VT Residents:** By responding to this offer, you consent to our obtaining your credit report in connection with this extension of credit, and subsequent credit reports for the purpose of reviewing the account, increasing the credit line, taking collection action or other legitimate purposes associated with your account. **WI Residents:** No provision of a marital property agreement, unilateral statement, or court order applying to marital property will adversely affect a creditor's interests unless prior to the time credit is granted the creditor is furnished with a copy of the agreement, statement or court order, or has actual knowledge of the provision.

American Airlines Federal Credit Union • MD 2100, P.O. Box 619001 • Dallas/Fort Worth Airport, Texas 75261-9001. For branch locations and office hours, visit www. AACreditUnion.org or call (800) 533-0035.

---

**PRESCREEN & OPT-OUT NOTICE:** This "prescreened" offer of credit is based on information in your credit report indicating that you meet certain criteria. This offer is not guaranteed if you do not meet our criteria, including providing acceptable property as collateral. If you do not want to receive prescreened offers of credit from this and other companies, call the consumer reporting agencies toll-free, 1-888-5-OPT-OUT (1-888-567-8688); or write:

| Transunion | Equifax Options / CSC | Experian Target Marketing |
|---|---|---|
| Name Remove Opt-Out Request | P.O. Box 740123 | P.O. Box 919 |
| P.O. Box 97328 | Atlanta, GA 30374-0123 | Allen, TX 75013-0919 |
| Jackson, MS 39288-7328 | | |

---

## Balance Transfer Option

Transfer the amount(s) shown from Visa, MasterCard, Discover, American Express or any other store card account(s) listed below to my new account:

| | | |
|---|---|---|
| Account # _____ | Account # _____ | Account # _____ |
| Credit Issuer _____ | Credit Issuer _____ | Credit Issuer _____ |
| Issuer Address _____ | Issuer Address _____ | Issuer Address _____ |
| City _____ | City _____ | City _____ |
| State _____ Zip _____ | State _____ Zip _____ | State _____ Zip _____ |
| Phone_____ | Phone_____ | Phone_____ |
| Amount to transfer $ _____ | Amount to transfer $ _____ | Amount to transfer $ _____ |

AAFCU000101

**American Airlines**
**Federal Credit Union**   MB 2100, P.O. Box 619001
Dallas-Fort Worth Airport, TX 75260-9001
(800)533-0035
www.AACreditUnion.org

# APPENDIX II



## Platinum Rewards

### VISA® CREDIT CARD AGREEMENT

In this Agreement the words "you" and "your" mean each and all of those who agree to be bound by this Agreement; "Card" means the VISA credit card and any duplicates, renewals, or substitutions the Credit Union issues to you; "Account" means your VISA credit card line of credit account with the Credit Union, and "Credit Union" or "us" means the Credit Union whose name appears on this Agreement or anyone to whom the Credit Union transfers this Agreement.

1. **Using Your Account.** If you are approved for an Account, the Credit Union will establish a line of credit for you and notify you of your credit limit. You agree that your credit limit is the maximum amount (purchases, cash advances, finance charges, plus "other charges") that you will have outstanding on your Account at any time. If you are over your credit limit, you must pay the amount you are over before payments will begin to restore your credit limit. You may request an increase in your credit limit by a method acceptable to the Credit Union. The Credit Union has the right to reduce your credit limit, refuse to make an advance and/or terminate your Account at any time for any reason not prohibited by law.

2. **Using Your Card.** You may use your Card to make purchases from merchants and others who accept VISA Cards. However, you may not use your Card to initiate any type of gambling transaction. If you wish to pay for goods or services over the Internet, you may be required to provide card number security information before you will be permitted to complete the transaction. In addition, you may obtain cash advances from the Credit Union and from other financial institutions that accept VISA Cards, and from some automated teller machines (ATMs). (Not all ATMs accept VISA Cards.) To obtain cash advances from an ATM, you must use the Personal Identification Number (PIN) that is issued to you for use with your Card. You agree that you will not use your Card for any transaction that is illegal under applicable federal, state or local law. You agree that any illegal use of the Card will be deemed an act of default under this Agreement. You further agree to waive any right to take legal action against the Credit Union for your illegal use of the Card and to indemnify and hold the Credit Union and VISA International, Inc. harmless from and against any lawsuits, other legal action, or liability that results directly or indirectly from such illegal use.

3. **Others Using Your Account.** If you allow anyone else to use your Card, you will be liable for all credit extended to such persons. You promise to pay for all purchases, balance transfers, and cash advances made by anyone whom you authorize to use your Card, whether or not you notify us that he or she will be using it. If someone else is authorized to use your Card and you want to end that person's privilege, you must notify us in writing, and if he or she has a Card, you must return the Card with your written notice for it to be effective.

4. **Responsibility.** You agree to pay all charges (purchases, balance transfers, and cash advances) to your Account that are made by you or anyone whom you authorize to use your Account. You also agree to pay all finance charges and other charges added to your Account under the terms of this Agreement or another agreement you made with the Credit Union. If this is a joint Account, Section 20 below also applies to your Account.

5. **Convenience Checks.** The Credit Union may, at its discretion, issue checks to you which may be used for any purpose other than making a payment for credit to any of your Credit Union accounts. By signing such checks, you authorize us to pay the item for the amount indicated and post such amount as a cash advance to your Account. The Credit Union does not have to pay any item, which would cause the outstanding balance in your Account to exceed your credit limit. Charges that apply in connection with the use of Convenience Checks are as follows: Stop Payment on Check $25.00 and Non-Sufficient Funds Check (NSF) $25.00. Fees will be assessed at the time they are incurred.

6. **Finance Charges.** New purchases posted to your Account during a billing cycle will not incur a finance charge for that billing cycle if you had a zero or credit balance at the beginning of that billing cycle or you paid the entire New Balance on the previous cycle's billing statement by the Payment Due Date of that statement; otherwise a finance charge will accrue from the date a purchase is posted to your Account. To avoid an additional finance charge on the balance of purchases, you must pay the entire New Balance on the billing statement by the Payment Due Date of that statement. A finance charge begins to accrue on cash advances from the date you get the cash advance or from the first day of the billing cycle in which the cash advance is posted to your Account, whichever is later. For purposes of this Agreement, balance transfers are treated as cash advances.

The finance charge is calculated separately for purchases and cash advances. For purchases, the finance charge is computed by applying the monthly periodic rate to the average daily balance of purchases. To get the average daily balance of purchases, we take the beginning outstanding balance of purchases each day, add any new purchases, and subtract any payments and/or credits. This gives us the daily balance of purchases. Then, we add all the daily balances of purchases for the billing cycle together and divide the total by the number of days in the billing cycle. This gives us the average daily balance of purchases.

For cash advances, the finance charge is computed by applying the monthly periodic rate to the average daily balance of cash advances. To get the average daily balance of cash advances, we take the beginning outstanding balance of cash advances each day, add in any new cash advances, and subtract any payments and/or credits that we apply to the cash advance balance. This gives us the daily balance of cash advances. Then, we add all the daily balances of cash advances for the billing cycle together and divide the total by the number of days in the billing cycle. This gives us the average daily balance of cash advances.

The **ANNUAL PERCENTAGE RATE** is based on certain credit-worthiness criteria. After you have been approved for an Account, the Credit Union may review your credit standing from time to time and adjust your periodic rate and corresponding ANNUAL PERCENTAGE RATE by providing you with an advance change-in-terms notice in accordance with applicable law.

Please refer to your congratulatory letter for your individual rate.

The periodic rate and corresponding **ANNUAL PERCENTAGE RATE** for purchases, cash advances and balance transfers is also based on an index ("Index"), which is the Prime Rate as quoted in the Money Rates section of *The Wall Street Journal* on the last business day of each quarter and is subject to change quarterly. Any change in the periodic rate and corresponding **ANNUAL PERCENTAGE RATE** will be effective on the first day of the calendar quarter following the date of the Index change. To determine your **ANNUAL PERCENTAGE RATE**, we will add a margin of 3.99%, 6.99% or 9.99% to the Index, based on your credit standing.

The **ANNUAL PERCENTAGE RATE** will never be greater than 18.0%. Any increase in the Index will result in an increase in the periodic rate, which in turn may result in higher payments as reflected by the Total Minimum Payments Due on the statement. If the Index is no longer available, the Credit Union will choose a new index, which is based upon comparable information. If the Credit Union changes your periodic rate and corresponding **ANNUAL PERCENTAGE RATE** based on your credit standing, then your margin will also change to 3.99%, 6.99% or 9.99%, based on your credit standing. Please refer to the letter included with this Agreement for a disclosure of the current rates that apply to you Account.

From time to time, the Credit Union may offer a balance transfer introductory rate for the first six (6) billing cycles from the date of Card issuance. During the introductory period, we will also waive any balance transfer fees that we would normally charge for balance transfer transactions. If you qualify for the introductory rate offer, your introductory periodic rate for balance transfers will be 0.00%, 0.325% or 0.6583%, depending on your creditworthiness which corresponds to an **ANNUAL PERCENTAGE RATE** of 0.00%, 3.9% or 7.9%, respectively. Please refer to the letter included with this Agreement for a disclosure of any balance transfer introductory rate that applies to your Account.

When you are thirty (30) days or more delinquent in making a payment or past due twice in a twelve (12) month period, the monthly periodic rate on your Account will increase to 1.50% per month, which is an **ANNUAL PERCENTAGE RATE** of 18.0%. When your Account has been no more than five (5) days past due during a twelve (12) month period, contact the Credit Union to apply for a rate reduction. In addition to the Finance Charges calculated above, for cash advances and balance transfers, a FINANCE CHARGE of $5.00 or 1% of the cash advance or balance transfer amount, whichever is greater, will be charged to your Account. A minimum FINANCE CHARGE of $0.50 will be assessed for any billing cycle in which a finance charge is due except for Puerto Rico.

7. **Other Charges.** The following other charges (fees) will be added to your Account, as applicable:

   a. **Over-the-Credit-Limit Fee**: You may be charged a fee of $25.00 on a statement date if your New Balance anytime during the billing cycle, less any fees imposed during the cycle, exceeds 10% or $500 over your credit limit, whichever is less. You will be charged the fee each subsequent month until your New Balance on the statement date, less any fees imposed during the cycle, is BELOW your credit limit.

   b. **Late Payment Fee**: If no payment is received on the Payment Due Date as listed on your statement, a late charge of $25.00 will be added to your Account.

   c. **Return Check Fee**: If a check, share draft, or other order used to make a payment on your Account is returned unpaid, you will be charged a fee of $25.00 for each item or other payment order returned.

   d. **Card Replacement Fee**: You will be charged $3.50 for each replacement Card that is issued to you for any reason.

   e. **Rush Fee**: 1 day rush $50.00; 2 day rush $25.00. Rush services are for the Card only; no rush on PIN.

   f. **Document Copy Fee**: You will be charged $6.00 for each copy of a sales draft or statement that you request (except when the request is made in connection with a billing error made by the Credit Union).

   g. **Collection Costs**: You agree to pay all costs of collecting the amount you owe under this Agreement, including court costs and reasonable attorney's fees.

8. **Payments.** Each month you must pay at least the minimum payment shown on your statement by the date specified on the statement or no later than twenty-one (21) days from the statement closing date, whichever is later. You may pay more frequently, pay more than the minimum payment or pay the Total New Balance in full. If you make extra or larger payments, you are still required to make at least the minimum payment each month your Account has a balance (other than a credit balance). The minimum payment is 2% of your Total New Balance, or $20.00, whichever is greater, plus the amount of any prior minimum payments that you have not made, and any amount you are over your credit limit. The Credit Union also has the right to demand immediate payment of any amount by which you are over your credit limit. All payments on your Account will be applied first to collection costs, then to any finance charge and other fees due, and then to the unpaid principal balance. Interest paid or agreed to be paid shall not exceed the maximum amount permissible under applicable law, and in any contingency whatsoever, if the Credit Union shall receive anything of value deemed interest under applicable law which would exceed the maximum amount of interest permissible under applicable law, the excessive interest shall be applied to the reduction of the unpaid principal amount or refunded to you.

9. **Payment Allocation.** Subject to applicable law, your payments may be applied to what you owe the Credit Union in any manner the Credit Union chooses, including paying off the balances with the lowest interest rate first.

---

10. **Security Interest. You specifically grant the Credit Union a consensual security interest in all individual and joint accounts you have with the Credit Union now and in the future to secure repayment of credit extensions made under this Agreement. The granting of this security interest is a condition for the issuance of any Card, which you may use, directly or indirectly, to obtain extensions of credit under this Agreement.**

Shares and deposits in an Individual Retirement Account or in any other account that would lose special tax treatment under state or federal law if given as security are not subject to the security interest you are giving. You authorize the Credit Union to apply the balance in your individual or joint share accounts to pay any amounts due on your Account if you should default.

---

**ADDITIONAL SECURITY: If you have other loans with us, now or in the future, collateral securing those loans may also secure your obligations under this Agreement. Please read any security agreement you sign in order to determine if the collateral also secures your obligations under this Agreement and other agreements you have with us. A dwelling will never be considered as security for this Account, notwithstanding anything to the contrary in any other agreement.**

**11. Default.** You will be in default if you fail to make any minimum payment or other required payment by the date that it is due. You will be in default if you break any promise you make under this Agreement or any other agreement with the Credit Union. You will be in default if you die, file for bankruptcy or become insolvent; that is, unable to pay your obligations when they become due. You will be in default if anyone tries, by legal process, to take any of your money maintained with the Credit Union. You will be in default if you make any false or misleading statements in any credit application or credit update. You will also be in default if something happens that the Credit Union believes may substantially reduce your ability to repay what you owe. When you are in default, the Credit Union has the right to demand immediate payment of your full Account balance without giving you notice. You expressly waive any right to notice of the Credit Union's intention to accelerate your debt and notice that your debt has been accelerated. If immediate payment is demanded, you agree to continue paying finance charges, at the periodic rate charged before default, until what you owe has been paid, and any shares that were given as security for your Account may be applied towards what you owe.

**12. Liability for Unauthorized Use-Lost/Stolen Card Notification.** You agree to notify us immediately, orally or in writing at P.O. Box 30495, Tampa, FL 33630-3495 or telephone 1-866-AACC4YOU or 1 866-222-2496 twenty-four (24) hours a day, seven (7) days a week, of the loss, theft, or unauthorized use of your Credit Card. You may be liable for the unauthorized use of your Credit Card. You will not be liable for unauthorized use that occurs after you notify us of the loss, theft, or possible unauthorized use. You will have no liability for unauthorized purchases made with your Credit Card, unless you are grossly negligent or fraudulent in the handling of your Account or Card. The foregoing liability limitation does not apply in the case of cash advances obtained at an ATM. In any case, your liability will not exceed $50.

**13. Changing or Terminating Your Account.** The Credit Union may change the terms of this Agreement from time to time. Notice of any change will be given in accordance with applicable law. If permitted by law and specified in the notice to you, the change will apply to your existing Account balance as well as to future transactions. Either you or the Credit Union may terminate this Agreement at any time, but termination by you or the Credit Union will not affect your obligation to pay the Account balance plus any finance and other charges you owe under this Agreement. You are also responsible for all transactions made to your Account after termination, unless the transactions were unauthorized. The Card or Cards you receive remain the property of the Credit Union and you must recover and surrender to the Credit Union all Cards upon request or upon termination of this Agreement whether by you or the Credit Union. The Credit Union has the right to require you to pay your full Account balance at any time after your Account is terminated, whether it is terminated by you or the Credit Union. If this is a joint Account, Section 20 of this Agreement also applies to termination of the Account.

**14. Credit Review and Release of Information.** You authorize the Credit Union to investigate your credit standing when opening or reviewing your Account. You authorize the Credit Union to disclose information regarding your Account to credit bureaus and creditors who inquire about your credit standing. If your Account is eligible for emergency cash and/or emergency card replacement services, and you request such services, you agree that we may provide personal information about you and your Account that is necessary to provide you with the requested service(s).

> **15. NOTIFICATION ADDRESS FOR INFORMATION REPORTED TO CONSUMER REPORTING AGENCIES:** We may report the status and payment history of your Account to credit reporting agencies each month. If you believe that the information we have reported is inaccurate or incomplete, please notify us in writing at **AAFCU, P.O. Box 30495, Tampa, FL 33630-3495.** Please include your name, address, home telephone number and Account number.

**16. Returns and Adjustments.** Merchants and others who honor your Card may give credit for returns or adjustments, and they will do so by sending the Credit Union a credit slip, which will be posted to your Account. If your credits and payments exceed what you owe the Credit Union, the amount will be applied against future purchases and cash advances. If the credit balance amount is $1 or more, it will be refunded upon your written request or automatically after six (6) months.

**17. Additional Benefits/Card Enhancements.** The Credit Union may from time to time offer additional services to your Account, such as travel accident insurance, at no additional cost to you. You understand that the Credit Union is not obligated to offer such services and may withdraw or change them at any time.

**18. Foreign Transactions.** Purchases and cash withdrawals made in foreign countries and foreign currencies will be debited from your Account in U.S. dollars. The conversion rate to dollars will be determined in accordance with the operating regulations established by VISA International. Currently the currency conversion rate used to determine the transaction amount in U.S. dollars is generally either a government-mandated rate or the wholesale rate in effect the day before the transaction processing date, increased by one percentage point. The currency conversion rate used on the processing date may differ from the rate that would have been used on the purchase date or cardholder statement posting date.

**19. Merchant Disputes.** The Credit Union does not warrant any merchandise or services purchased by you with the Card. The Credit Union is not responsible for the refusal of any merchant or financial institution to honor your Card.

**20. Joint Accounts.** If this is a joint Account, each of you will be individually and jointly responsible for paying all amounts owed under this Agreement. This means that the Credit Union can require any one of you individually to repay the entire amount owed under this Agreement. Each of you authorizes the other(s) to make purchases or cash advances individually. Any one of you may terminate the Account and the termination will be effective as to all of you. Notice to one of you shall constitute notice to all of you.

**21. Effect of Agreement.** This Agreement is the contract, which applies to all transactions on your Account even though the sales, cash advances, credit or other slips you sign or receive may contain different terms.

**22. No Waiver.** The Credit Union can delay enforcing any of its rights any number of times without losing them.

**23. Statements and Notices.** Statements and notices will be mailed to you at the most recent address you have given the Credit Union. Notice sent to any one of you will be considered notice to all.

**24. Final Expression.** This Agreement is the final expression of the terms and conditions of this VISA line of credit between you and the Credit Union. This written Agreement may not be contradicted by evidence of any alleged oral agreement.

**25. Additional Provisions.** Each provision of this Agreement must be considered part of the total Agreement and cannot in any way be severed from it. However, if any provision of this Agreement is finally determined to be void or unenforceable under any law, rule, or regulation, all other provisions of this Agreement will remain valid and enforceable. This Agreement is performable in Tarrant County, Texas, and the validity, construction, and enforcement of this Agreement shall be governed by applicable federal law and the laws of the State of Texas. The Card remains our property at all times, and you agree to immediately surrender the Card upon demand. You agree to pay any costs the Credit Union incurs in recovery of the Card. The Credit Union can accept late payments or partial payments, or checks or money orders marked "payment in full" without losing any of its rights under this Agreement. You agree to give us prompt notice of any change in your name, mailing address, telephone number or place of employment.

**26. Receipt of and Agreement to Terms of Agreement.** By using the Card, you agree to all of the terms and conditions and promise to perform all of the obligations, requirements, and duties contained in this Agreement. You acknowledge that you have received a copy of this Agreement.

## YOUR BILLING RIGHTS
## KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

Notify Us In Case of Errors or Questions About Your Bill

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

- Your name and Account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your credit card bill automatically from your savings or share draft account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your Rights and Our Responsibilities After We Receive Your Written Notice**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct. After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply an unpaid amount against your credit limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is. If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

**Special Rule for Credit Card Purchases**
If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two (2) limitations on this right:

(a) You must have made the purchase in your home state or, if not within your home state, within one hundred (100) miles of your current mailing address; and

(b) The purchase price must have been more than $50

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

© CUNA Mutual Group, 1993, 2004                                                    23480rvp  29311  080604